SLIP OP. 04-68

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| COMMITTEE FOR FAIR COKE TRADE AND UNITED STEELWORKERS OF AMERICA, AFL-CIO/CLC, | : : : : | |
| PLAINTIFFS, | : : : | |
| V. | : : | COURT NO. 01-00826 PUBLIC VERSION |
| UNITED STATES OF AMERICA AND THE UNITED STATES INTERNATIONAL TRADE COMMISSION, | : : : : : | |
| DEFENDANTS, | : : | |
| AND | : : | |
| CITIC TRADING COMPANY, LTD., MINMETALS TOWNLORD TECHNOLOGY, LTD., DUFERCO, SA, MITSUBISHI CHEMICAL CORPORATION, AND MITSUI MINING COMPANY, LTD., | : : : : : : | |
| DEFENDANT- INTERVENORS. | : : : | |

[Plaintiffs' motion for judgment upon an agency record is denied; United States International Trade Commission's negative preliminary injury determination, as modified on remand, is sustained.]

Dated: June 10, 2004

*Wilmer Cutler Pickering, LLP* (*W.N. Harrell Smith, IV*, *John D. Greenwald*, *John P. Maloney, Jr.*, *Steve Charnovitz*), for Plaintiffs Committee for Fair Coke Trade and the United Steelworkers of America, AFL-CIO/CLC.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission; *James M. Lyons*, Deputy General Counsel, United States International Trade Commission; *Karen*

*Veninga Driscoll*, Attorney Advisor, for Defendant United States International Trade Commission.

    *Manatt, Phelps & Phillips, LLP (Jeffrey S. Neeley)*, for Defendant-Intervenors CITIC Trading Company, Ltd. and Minmetals Townlord Technology, Ltd.

    *White & Case, LLP* (*Walter J. Spak*, *Adams C. Lee*, *Frank H. Morgan*), for Defendant-Intervenor Duferco, SA.

    *Cleary, Gottlieb, Steen & Hamilton* (*Donald L. Morgan*), for Defendant-Intervenor Mitsubishi Chemical Corporation.

    *Bingham McCutchen, LLP* (*Roger L. Selfe*), for Defendant-Intervenor Mitsui Mining Company, Ltd.


## OPINION

*EATON, Judge*: This matter is before the court following remand to the United States International Trade Commission ("ITC"). In *Committee for Fair Coke Trade v. United States*, 27 CIT __, slip op. 03-56 (May 20, 2003) ("*CFCT I*"), the court remanded the ITC's negative preliminary injury determination[1] concerning blast furnace coke[2] from China and Japan, specifically with respect to its attenuated competition finding. *See* Blast Furnace Coke from China and Japan, USITC Pub. 3444, Inv. Nos. 731-TA-951–952 (Aug. 2001), List 2, Doc. 53 ("Preliminary Determination"). On remand, the ITC expressed its views in Blast Furnace Coke from China and Japan, USITC

---

[1]    This negative preliminary determination resulted in termination of the investigation. *See* 19 U.S.C. § 1673b(a)(1) (2000); 19 C.F.R. § 207.18 (2000).

[2]    The scope of the ITC investigations covered "blast furnace coke made from coal or mostly coal and other carbon materials, with a majority of individual pieces less than 100 MM (4 inches) of a kind capable of being used in blast furnace operations, whether or not mixed with coke breeze." Certain Blast Furnace Coke Prods. From the P.R.C. and Japan, 66 Fed. Reg. 39,009, 39,009 (Dep't Commerce July 26, 2001) (notice of initiation of antidumping duty investigations). "[C]oke breeze is the fine screenings from crushed coke used predominantly as a fuel source in the process of agglomerating iron." Mem. INV-Y-146 (Aug. 9, 2001), List 2, Doc. 23, as revised by Mem. INV-Y-151 (Aug. 10, 2001), List 2, Doc. 22 ("Staff Report") at I-5 n.10.

Pub. 3619, Inv. Nos. 731-TA-951–952 (Aug. 2003), List 2, Doc. 112R ("Remand

Determination"), and an accompanying appendix ("Appendix"). Jurisdiction lies pursuant to 28

U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(1)(C) (2000). For the reasons discussed

below, plaintiffs Committee for Fair Coke Trade and United Steelworkers of America, AFL-

CIO/CLC's ("Plaintiffs") Motion for Judgment Upon the Agency Record is denied and the

Preliminary Determination, as modified on remand, is sustained.


## BACKGROUND

In response to a petition filed by Plaintiffs, the ITC instituted antidumping investigations

of imports of blast furnace coke from China and Japan in June 2001.[3] *See* Blast Furnace Coke

From China and Japan, 66 Fed. Reg. 35,669 (ITC July 6, 2001) (institution of antidumping duty

investigations). In conducting its investigations, the ITC distributed questionnaires to importers,

foreign producers, and domestic producers.[4] In addition, a public conference was held on July

20, 2001, during which interested parties and their counsel presented testimony and answered

questions posed by the Commissioners.[5] The ITC considered the testimony of the witnesses,

---

[3]       The period of investigation covered January 1998 through March 2001. *See* Staff Report at I-3.

[4]       Because some of the domestic producers of blast furnace coke are also end users, the ITC included questions in the domestic producer questionnaires that normally appear in the purchaser questionnaires. *See* Remand Determination at 16 n.65. These questions sought information concerning, *inter alia*, "whether demand had changed for the end products since January 1998, and what characteristics the firm considered when determining the quality of blast furnace coke." *Id.* "Thus, in these investigations, [the ITC had] purchaser information that [it] frequently [has] not yet obtained in preliminary phase investigations." *Id.* (citation omitted).

[5]       "Although a hearing is not required in a preliminary determination proceeding,
(continued...)

briefs and exhibits submitted in connection with the public conference, the information contained

in the petition, responses to its questionnaires, and two studies conducted by the ITC pursuant to

19 U.S.C. § 1332(a),[6] related to metallurgical coke.  Following this review, the ITC concluded

that there was no reasonable indication of material injury, or threat thereof, by reason of imports

of blast furnace coke from China and Japan ("Subject Imports").  *See* Blast Furnace Coke from

China and Japan, 66 Fed. Reg. 45,692 (ITC Aug. 29, 2001) (notice of neg. prelim.

determination).


In making its negative determination, the ITC examined the conditions of competition in

the industry.  In doing so, the ITC found that competition between the domestic like product and

the Subject Imports was "attenuated" for two reasons.  First, "a significant amount of subject

imports [was] transported over water[7] and sold directly to steel makers at steel plants with port

---

[5](...continued)
ITC often includes . . . a public conference 'at which interested parties may present their views without the opportunity for cross-examination.'"  *Am. Lamb Co. v. United States*, 785 F.2d 994, 1003 (Fed. Cir. 1986) (quoting *Budd Co., Ry. Div. v. United States*, 1 CIT 67, 72, 507 F. Supp. 997, 1001 (1980)).  Here, representatives of the domestic blast furnace coke industry, including the United Steelworkers of America, Shenango Inc., Acme Steel Co., and Koppers Industries, Inc. appeared as witnesses in support of the imposition of antidumping duties.  Representatives of the Chinese and Japanese blast furnace coke industries, including Mitsubishi Chemical Corp. ("Mitsubishi"), Mitsui Mining Company, Ltd. ("Mitsui"), and Duferco, SA appeared as witnesses in opposition to the imposition of antidumping duties.  *See* Staff Report, App. B-3–B-5.

[6]        The ITC considered *Metallurgical Coke: Baseline Analysis of the U.S. Industry and Imports*, USITC Pub. 2745, Inv. No. 332-342 (Mar. 1994), which the ITC referred to as the "Section 332 Study" in the Appendix at 3 n.4, and *Foundry Coke: A Review of the Industries in the United States and China*, USITC Pub. 3323, Inv. No. 332-407 (July 2000).

[7]        In *CFCT I*, the court noted that by "over water" the ITC appeared to mean by
                                                                                (continued...)

facilities," and, thus, the Subject Imports were restricted to delivery at limited locations and were more economical for the purchaser to receive; and second, "blast furnace coke transported over water result[ed] in less product deterioration than blast furnace coke transported over land." Prelim. Determination at 12. As a result, the ITC concluded that the majority of Subject Imports "to a great extent" did not compete with domestically produced blast furnace coke. *Id*. at 26.

In *CFCT I*, the court addressed Plaintiffs' challenge to the ITC's attenuated competition finding. Upon considering each of the sources cited by the ITC in support of its mode of transportation and product quality findings,[8] the court found:

> The ITC has not adequately articulated its reasons for finding that
> competition between the Subject Imports and the domestic like
> product is attenuated—indeed, it is not clear from the Preliminary
> Determination at what point competition becomes
> "attenuated"—nor does the evidence cited by the ITC, with respect
> to its mode of transportation and delivery and product quality
> findings, demonstrate that, in fact, direct competition does not
> exist.

*CFCT I*, 27 CIT at __, slip op. 03-56 at 26–27 (citing *Bowman Transp., Inc. v. Ark.-Best Freight*

---

[7](...continued)
oceangoing vessel and possibly by "Panamax" vessel. *CFCT I*, 27 CIT at __, slip op. 03-56 at 9 n.6. "'Panamax' refers to the maximum dimensions allowable to permit the vessel to go through the Panama Canal . . . ." 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 10–4, at 590 n.4 (4th ed. 2004).

[8]     The ITC claimed the following sources in support of these findings: (1) the testimony of Dr. Bruce Malashevich, President of Economic Consulting Services, Inc., (2) a brief submitted to the ITC by Duferco, SA, *see* Duferco, SA's Postconference Br., Pub. R. List 1, Doc. 35 ("Duferco Brief"), (3) the affidavit of Mr. Jack Palmer, Vice President of Raw Materials for Duferco Steel, an exporter of Chinese blast furnace coke, *see* Duferco Br., Ex. 3 ("Palmer Affidavit"), and (4) a brief submitted jointly by Mitsubishi and Mitsui, *see* Mitsubishi's and Mitsui's Postconference Br., Pub. R. List 1, Doc. 38 ("Joint Japanese Brief").

*Sys., Inc.*, 419 U.S. 281, 285–86 (1974); *Altx, Inc. v. United States*, 26 CIT __, __, slip op. 02-

154 at 4 (Dec. 31, 2002)).  The court thus remanded the finding of attenuated competition so that

it could explain this finding.  The court directed the ITC to:

> (1) explain the methodology and standards employed in reaching
> the conclusion that "to a great extent [Subject Imports] do not
> compete with domestically produced blast furnace coke," Prelim.
> Determination at 19; (2) state with specificity the factors
> underlying its finding of attenuated competition; (3) state whether
> U.S. purchasers of Subject Imports comprise a separate market and
> cite the record evidence to support such conclusion, if any; (4) state
> with specificity any record evidence demonstrating that lower costs
> resulting from waterborne transport of the Subject Imports created
> a separate market for the Subject Imports; (5) state with specificity
> any record evidence demonstrating that it is "far more economical"
> for Subject Imports to be delivered by waterborne transport when
> compared with modes of transportation available to the domestic
> like product; (6) quantify the cost differences resulting from
> waterborne transport and delivery of the Subject Imports when
> compared with the cost of transport of the domestic like product;
> (7) state the percentage of Subject Imports unloaded directly from
> Panamax vessels and other oceangoing ships directly for use in the
> United States; (8) state with specificity any record evidence
> demonstrating that the superior quality resulting from waterborne
> transport or delivery of the Subject Imports created a separate
> market for the Subject Imports; (9) examine the significance of the
> manner and frequency of handling of the Subject Imports in its
> product quality analysis; (10) state with specificity any record
> evidence demonstrating that the Subject Imports are superior in
> quality to the domestic like product and specify in what way the
> Subject Imports are superior; (11) state with specificity any record
> evidence demonstrating a preference on behalf of U.S. blast
> furnace coke consumers for the Subject Imports based on product
> quality; and (12) state with specificity any record evidence that the
> Subject Imports and the domestic like product are not fungible.

*Id.* at 27–28.  The Appendix contains the ITC's enumerated responses to these instructions.


An examination of the Remand Determination reveals that the ITC has changed its focus

as to some matters and provided a more complete explanation as to others.  On remand, the ITC

(1) provided for the first time a definition of attenuated competition that substantially reduces the

degree to which it claims Subject Imports did not compete with the domestic like product and

thus the evidence needed to establish the claim, (2) minimized the importance of attenuated

competition in its determination, and (3) provided a fuller explanation of its findings such that

the ITC's Remand Determination establishes with clear and convincing evidence that there is no

reasonable indication of material injury or threat of such injury by reason of Subject Imports.  *See*

*Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).  Moreover, Plaintiffs have

not shown that any likelihood exists that contrary evidence will arise in a final investigation.[9]  *Id*.

The legal standard for negative preliminary injury determinations having been satisfied, the court

sustains the Preliminary Determination, as modified on remand.


## STANDARD OF REVIEW

When reviewing a preliminary injury determination, "[t]he court shall hold unlawful any

determination, finding, or conclusion found . . . to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(A); *see also Co-Steel*

*Raritan, Inc. v. United States Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004) ("[A]

preliminary determination by the Commission must be upheld unless it is 'arbitrary, capricious,

---

[9]     Plaintiffs argue generally, that evidence "to be gathered in a final investigation has the potential or probability of being contrary to evidence on which the Commission Majority's findings, conclusions, and determinations rely."  Pls.' Conf. Mem. Supp. Mot. J. Agency R. ("Pls.' Mem.") at 7.  Where Plaintiffs make more specific arguments with respect to the likelihood that contrary evidence would arise in a final investigation, the court addresses such arguments.

an abuse of discretion, or otherwise not in accordance with law.'"). In the course of its review, the court must examine "whether the [ITC] has articulated the requisite rational connection between the facts found and the choice made" in light of the reasonable indication standard set forth in 19 U.S.C. § 1673b(a). *See Calabrian Corp. v. United States Int'l Trade Comm'n*, 16 CIT 342, 344–45, 794 F. Supp. 377, 381 (1992) (applying 19 U.S.C. § 1673b(a) (1988)); *Conn. Steel Corp. v. United States*, 18 CIT 313, 315, 852 F. Supp. 1061, 1064 (1994) ("[The court's] role is to ascertain whether there was a rational basis for the [ITC's] determination . . . .") (citation omitted). This standard requires that "[t]he ITC . . . decide whether there is a reasonable indication for finding '(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.'" *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 877, 74 F. Supp. 2d 1353, 1368 (1999) (quoting *Am. Lamb Co.*, 785 F.2d at 1001). The court in turn, "must 'consider whether the [ITC's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Tex. Crushed Stone Co. v. United States*, 35 F.3d 1535, 1540 (Fed. Cir. 1994) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

### DISCUSSION

As *CFCT I* only addressed issues concerning the ITC's finding that competition between the domestic like product and the Subject Imports was "attenuated," the court did not discuss other issues relating to the determination of no reasonable indication of material injury or threat of material injury. The court will first address the ITC's findings on remand with respect to

attenuated competition, and then those issues not discussed in *CFCT I*.

I.      *Attenuated Competition*

While never defining the term in the Preliminary Determination, on remand, the ITC

stated that attenuated competition means competition that is "reduced [in] force or effect."[10]

Remand Determination at 3.  This is a clear change from the Preliminary Determination where an

important element was that, as a result of attenuated competition, a majority of the Subject

Imports and the domestic like product "to a great extent" did not compete.  Thus, on remand, the

ITC lessened the degree to which it found the products not to compete, and therefore, the

evidence needed to reach its finding of attenuated competition.  In addition, the ITC insists, on

remand, that its finding of attenuated competition was "one finding among many that support

[its] negative determinations."  App. at 27.  Indeed, this claim is borne out in the Remand

Determination in which the construct of attenuated competition is now almost entirely absent[11] in

those portions dealing with reasonable indication of material injury and threat.

The court examines the ITC's findings on remand, and Plaintiffs' challenges to those

---

[10]     While on remand the ITC defined attenuated competition as competition that is
"reduced [in] force or effect," this definition is at odds with the language found in the
Preliminary Determination.  *See, e.g.*, Prelim. Determination at 26 (indicating the majority of
Subject Imports "to a great extent do not compete with domestically produced blast furnace
coke"); *id*. at 34 (noting "the limited direct competition between imports and domestic blast
furnace coke in these investigations").

[11]     In the Remand Determination, the phrase "attenuated competition" is not found in
the ITC's volume, price effects, or impact analyses, and is only mentioned in one footnote in its
no reasonable indication of threat analysis.  *See* Remand Determination at 36 n.147.

findings, in turn.

**1.      *The Court's Instruction to Explain the Methodology and Standards Employed in Reaching the Conclusion That Subject Imports to a Great Extent Do Not Compete with Domestically Produced Blast Furnace Coke***

In the Preliminary Determination, the ITC did not state the methodology it employed to determine that competition between the Subject Imports and the domestic like product was attenuated.  Thus, the court directed the ITC to do so on remand.  In response, the ITC recited the statutory factors it is required to consider in making its material injury analysis:

> We are statutorily required to analyze the relevant economic factors, including the volume of subject imports, price effects of subject imports, and their impact on the domestic industry, in the context of the conditions of competition distinctive to the industry under investigation.  *We do not analyze the conditions of competition in an industry based on a specific set of factors*, as, for example, we do for our domestic like product analysis, because each industry is different.

> In considering the conditions of competition in the U.S. market for blast furnace coke, we have considered the entire record, and in particular the staff report and related data, questionnaire responses, the Commission's prior Section 332 Study of Metallurgical Coke, the Palmer Affidavit, the conference testimony of Petitioners and Respondents, the arguments and submissions of the parties, the location of domestic blast furnace coke production plants, and steel plants, and the purchasing patterns of customers of both domestic and imported blast furnace coke.

App. at 2–3 (internal citation and footnote omitted) (emphasis added).  Thus, the ITC acknowledged that, with respect to its finding of attenuated competition found in the Preliminary Determination, it had no particular standards for measuring the extent of competition.  In addition, beyond reciting the evidence examined, the ITC claimed, and continues to claim, no special methodology for considering the evidence of competition.

Next, claiming that it had satisfied the court's instruction with respect to methodology, the ITC went on to discuss its findings with respect to certain domestic steel producers'[12] purchases of Subject Imports, i.e., that (1) a portion of Subject Imports were consumed at Plant A and Plant B, App. at 2, (2) these plants consumed the majority of total Subject Imports,[13] and (3) "subject imports and domestic product are [[

]] . . . ."[14]  *Id.* (emphasis added).

Plaintiffs argue that the ITC did not comply with the court's first instruction by failing to explain the methodology or standards used to make its attenuated competition finding.  *See* Pls.' Conf. Comments on ITC's Remand Results ("Pls.' Comments") at 9.  Plaintiffs assert that, rather than stating a methodology, the ITC simply stated its conclusion, i.e., that where a steel mill used both Subject Imports and domestic shipments, they competed, and where a steel mill did not use both Subject Imports and domestic shipments, they did not compete.  *See id.*  Plaintiffs state that "[s]uch an answer to the Court's question is not based on clear and convincing evidence."  *Id.*

---

[12]          These domestic steel producers were  [[                              ]] and [[
                 ]].  To preserve confidentiality, these companies shall be referred to as Company A and Company B, respectively.  Company A's [[
                 ]] is referred to as Plant A.  Company B's [[
                 ]] is referred to collectively as Plant B, unless otherwise indicated.

[13]          The ITC calculated the percentage of Subject Imports imported or purchased by Company A and Company B to be [[          ]] in 2000, according to data in the record.  No challenge has been made to the accuracy of that calculation.  *See* App. at 2 n.2 (explaining how the ITC arrived at the [[          ]] figure).

[14]          Company B's [[
                 ]].  The ITC found Chinese imports of blast furnace coke were not interchangeable with the domestic like product for such applications.  App. at 2 n.3; Prelim. Determination at 13 n.59.

It is clear that the ITC did not employ a particular methodology or set of standards in reaching its conclusion that the majority of Subject Imports "to a great extent do not compete with domestically produced blast furnace coke . . . ." Prelim. Determination at 26. Having acknowledged this, the ITC has complied with the court's instructions. It is equally clear that the ITC has substantially reduced its claims as to the extent to which competition has been lessened (1) by its new definition of attenuated competition as merely "reduced [in] force or effect," and (2) by the evidence it sets out. Thus, the court will examine the evidence relating to the conditions of competition by using this new, clearly less stringent definition pronounced on remand, and not the standard found in the Preliminary Determination (i.e., that the Subject Imports imported or purchased by both Company A and Company B "to a great extent" did not compete with domestic product).

**2.      *The Court's Instruction to State with Specificity the Factors Underlying the ITC's Finding of Attenuated Competition***

The ITC stated that six "factors" influenced its finding that competition between the Subject Imports and the domestic like product was attenuated. Remand Determination at 8. These "factors" were:

> [1] the desire of importers/purchasers to have reliable access to large quantities of product and consistency in the blast furnace; [2] the limited and declining capacity of the domestic industry to supply additional product; [3] the contractual commitments limiting domestic producers from supplying additional purchasers; [4] freight costs and the desire to avoid degradation; [5] location of blast furnaces near or in relation to a port; and [6] certain quality differences (separate from degradation) between subject imports and the domestic product.

App. at 27.  It is worth noting that these "factors" are a mix of motivation, conclusions with respect to market conditions, existing business circumstances, and product differences.  Although the ITC's explanation is not entirely responsive to the court's remand instruction to "state with specificity the factors underlying the . . . finding of attenuated competition," it is worth examining in light of its new definition of attenuated competition, and to the extent it addresses evidence of the conditions of competition.

While not questioning the "factors" themselves, Plaintiffs question the evidence that the ITC cited with respect to each of these factors.  First, although Plaintiffs do not dispute that the importers/purchasers of blast furnace coke desire reliable access to large quantities of product and consistency in the blast furnace, they contend that the ITC failed to analyze whether coke from China or Japan is "'more uniform' in consistency than coke from the United States, so that there is only marginal competition between the sources of coke."  Pls.' Comments at 17.  Second, as to the limited and declining capacity of the domestic industry to supply additional product, Plaintiffs "agree[] that the domestic industry does not supply the domestic pig iron industry in all conditions of demand and there is at any time a deficit in the market, which is supplied by imports"; however, Plaintiffs argue that it is "irrational" to suggest that "the existence of a deficit filled by imports insulates the overall market from pricing and volume effects."  *Id*.  Third, with respect to contractual commitments limiting domestic producers' ability to supply additional purchasers, Plaintiffs claim that there is presently insufficient information on the record concerning contract price renegotiation and that if the ITC's investigation continued, purchaser questionnaires would elucidate the record on this issue.  *Id*. at 18.  As to the fourth and fifth

factors, i.e., freight costs, degradation, and the location of blast furnaces near port facilities,

Plaintiffs assert that "there is no evidence to quantify the transportation advantage or

disadvantage between particular domestic and foreign coke batteries and steel mills." *Id*. at

18–19. Finally, as to certain quality differences (separate from degradation) between Subject

Imports and the domestic like product, Plaintiffs argue that the evidence in the

record—specifically, testimony supplied by Plaintiffs, and certain questionnaire

responses—demonstrates that the Subject Imports and the domestic like product are reportedly

highly fungible and interchangeable.[15] *Id*. at 19–20.

As previously noted, Plaintiffs do not question the ITC's selection of "factors." Rather,

Plaintiffs' attack is directed at the sufficiency of the evidence supporting its conclusions with

respect to the "factors." After identifying the "factors," the ITC identified the evidence it used in

analyzing each one.

As to the first factor, the evidence shows that integrated producers required a reliable

supply of large volumes of blast furnace coke that is internally consistent. *See, e.g.*, [[

]] List 2, Doc. 99 at 4. [[

---

[15]    With respect to the likelihood that contrary information would arise in a final investigation on the issue of product quality, Plaintiffs argue that the ITC "defers issuing purchasers questionnaires until the final investigation and those questionnaires . . . would have answered whether and to what extent ash content, chemistry, and physical factors affect price . . . ." Pls.' Mem. at 6. The court notes that because in these investigations many purchasers are also end users, the ITC's questionnaires requested information with respect to product quality and other non-price factors, such as demand, that affect purchaser decisions. *See supra* note 4; *see also* Remand Determination at 16 n.65.

]]. *See id.*

("[[

]]."); [[                                                                              ]] List 2,

Doc. 82 at 12 (indicating [[                                                          ]]).


Second, the evidence indicates that the domestic industry's production capacity was limited and thus could not meet the purchasers' needs for a large supply of blast furnace coke. For example, in 2000, the most recent full year in the period of investigation, U.S. production capacity was 16,681,282 metric tons—the highest of any year considered—and capacity utilization was 96.7%. *See* Staff Report, tbl. III-2. Apparent U.S. consumption for that year was 19,039,887 metric tons. *Id.*, tbl. IV-4. In addition, several domestic producers sold all of their product output to one purchaser, further limiting the availability of domestic coke. *See, e.g.*, [[

]] Domestic Producers' Questionnaire Resp., List 2, Doc. 70 at IV.B.10;

[[                                        ]] Domestic Producers' Questionnaire Resp., List 2, Doc. 69 at

IV.B.10.


Third, the ITC argues that while "Plaintiffs want more data on contract terms, and pricing adjustments, . . . [they] have not demonstrated any likelihood that evidence contrary to the ITC's

Remand Determinations would be obtained if the investigations had been continued." Conf. Reply Comments of ITC to Pls.' Comments on Remand Results ("Def.'s Comments") at 12. The ITC claims that it not only had the information concerning, e.g., contract price renegotiation, that Plaintiffs allege is missing from the record, but it evaluated such information. *See id*. at 13 (citing Remand Determination at 24 n.101). In addition, long-term contracts did further tend to limit the ability of the domestic producers to supply the needs of purchasers. Questionnaire responses reveal that some sales were made pursuant to multiyear contracts. *See, e.g.*, [[

]] Domestic Producers' Questionnaire Resp., List 2, Doc. 75 at IV.B.4 ([[

]]). Moreover, price and quantity terms frequently were fixed. *See, e.g.*, [[

]] Domestic Producers' Questionnaire Resp., List 2, Doc. 80 at IV.B.4

(indicating [[                                                       ]]); List 2 Doc. 75 at IV.B.4 (indicating [[

]]).

Fourth, although it failed to quantify the difference in freight costs between waterborne transport and land transport, the ITC brought forward evidence to demonstrate that high freight costs associated with inland transportation were a factor in the attenuated competition finding. *See, e.g.*, [[                           ]][16] Domestic Producers' Questionnaire Resp., List 2, Doc. 71 at 2 ("[[

]]."). In addition, merchant producers tended to sell to purchasers with nearby steel mills to minimize such costs. *See, e.g.*, List 2, Doc. 70 at IV.B.6 (indicating [[

]]); List 2, Doc. 69 at

---

[16]    [[                                   ]] is located in [[                      ]].

IV.B.6 (same).

As to degradation and the location of blast furnaces near or in relation to a port, the only sources cited by the ITC in the Remand Determination that purport to address the benefits of waterborne transport are those that the court questioned in *CFCT I*. The ITC relied upon the Duferco Brief and statements made by Mr. Palmer to support the finding that "receiving the coke by water reduces the amount of handling of the coke, which in turn, reduces degradation." Remand Determination at 14 (citing Duferco Br. at 6–7, 18–19; Palmer Aff. at 1–2); *id*. at 7 (citing Palmer Aff. at 2; Tr. at 105). In *CFCT I*, the court examined the sources cited in the Duferco Brief, e.g., the testimony of Mr. Andrew Aloe, and found that this testimony "does not, in fact, indicate any economic benefits accruing to purchasers of the Subject Imports resulting from waterborne transport, but rather addresses the degradation that results from handling blast furnace coke . . . ." *CFCT I*, 27 CIT at __, slip op. 03-56 at 15. In addition, the court found that "[t]he clear purpose and import of the Palmer Affidavit . . . is that foreign shipments can be off-loaded at limited sites." *Id*. at 17. The ITC has presented nothing new here to alter its conclusions, i.e., that it is limited handling, not waterborne transport, that reduces degradation.

Finally, quality differences, separate from degradation, reportedly exist between the Subject Imports and the domestic like product. *See, e.g.*, List 2, Doc. 82 at 15 (noting [[

]]). In light of the purchasers' need for large amounts of coke and their desire to "avoid mixing too many different blends of coke, which can reduce productivity," the

ITC found that purchasers tended to favor the Subject Imports over the domestic like product, not because the domestic like product degraded as a result of its mode of transportation, but because of the desire of purchasers for product uniformity. Remand Determination at 8 & n.27 (citing, e.g., List 2, Doc. 99 at 4; List 2, Doc. 82 at 12; Staff Report at II-7–8). The record tends to support this finding.

Plaintiffs' arguments against the ITC's reliance on this evidence either urge a different interpretation of the evidence or claim that there is insufficient evidence to support the ITC's findings. While not all of the items cited by the ITC would normally be considered "factors," the ITC has demonstrated the evidence it took into account in making its finding of attenuated competition on remand, and has therefore complied with the court's instruction. As to Plaintiffs' apparent argument that "contrary evidence" with respect to contract price renegotiation would likely arise from a fuller investigation, the court notes that (1) Plaintiffs do not suggest, with any particularity, what that evidence might be, and (2) some domestic producers were also end users and so questions concerning contracts were included in the questionnaires.

### 3. *The Court's Instruction to State Whether U.S. Purchasers of Subject Imports Comprise a Separate Market*

In an effort to have the ITC state with specificity what it meant by the term "attenuated competition," the court instructed the ITC to state "whether U.S. purchasers of Subject Imports comprise a separate market and cite the record evidence to support such conclusion, if any . . . ." *CFCT I*, 27 CIT at __, slip op. 03-56 at 27. In response, the ITC stated:

> U.S. purchasers of subject imports do not comprise a separate
> market because there is some limited overlap of customers who
> purchase both subject imports and the domestic like product. For
> example, [[
>                               ]], and [[                              ]]
> purchase both subject imports from China and domestic product.

App. at 11 (footnotes and citations omitted).

Plaintiffs argue that the ITC's response is inadequate. According to Plaintiffs, the ITC's "two-sentence answer . . . conclude[s] [that] competition only exists where purchasers purchase[d] both domestic and Subject Imports and competition does not exist where they did not. The conclusion is assumed, not analyzed or explained, and the Court's pivotal question remains unanswered." Pls.' Comments at 10. The court finds that, by stating that purchasers of Subject Imports do not constitute a separate market, the ITC acknowledged that its attenuated competition finding, at least on remand, was not based on that premise.

### 4. *Whether Lower Costs Resulting From Waterborne Transport of the Subject Imports Created a Separate Market for the Subject Imports*

The ITC stated the following with respect to the court's fourth remand instruction:

> The logistics and costs related to moving blast furnace coke are
> one factor in [its] finding of attenuated competition. While we
> noted in our original determinations that sourcing coke through a
> port facility was reported to be less costly than transport over land
> to some blast furnace locations, we did not and do not assert now
> that lower costs resulting from waterborne transport of the subject
> imports created a separate market for them.

App. at 11. "Plaintiffs agree there is no separate market" for Subject Imports consumed at plants with port facilities. Pls.' Comments at 11. As such, the court finds the ITC's response to be an

adequate answer to the court's inquiry.

5.     ***The Court's Instruction to State with Specificity the Record Evidence Demonstrating That It Is "Far More Economical" for Subject Imports to be Delivered by Waterborne Transport When Compared with Modes of Transportation Available to the Domestic Like Product***

6.     ***The Court's Instruction to Quantify the Cost Differences Resulting from Waterborne Transport and Delivery of the Subject Imports When Compared with the Cost of Transport of the Domestic Like Product***

In *CFCT I*, the court found that the evidence cited for the proposition that waterborne transport was a "far more economical" means of transporting the Subject Imports from their port of origin to the United States was unreliable because it lacked specific comparisons of the cost of water versus land transport. *See CFCT I*, 27 CIT at __, slip op. 03-56 at 13–18. In response to the court's fifth and sixth remand instructions, the ITC made several findings. It found: (1) "blast furnace coke has a low ratio of value to weight,"[17] App. at 12, (2) "rail was by far the most common means of transporting blast furnace coke by the domestic producers to their customers in the United States," and continues to be the mode of transport commonly used for domestic shipment, *id*., (3) "it cost approximately $0.07 per mile per ton to ship blast furnace coke from Pittsburgh, Pennsylvania to Baltimore, Maryland by rail, and $0.02 per [mile] per [ton] to ship blast furnace coke from Pittsburgh to Birmingham, Alabama by rail," *id*. at 13, and (4) "[b]arge rates were significantly lower," i.e., "[i]t cost approximately $0.01 per ton per mile to ship blast furnace coke by barge from Pittsburgh, Pennsylvania to Ashland, Kentucky, Birmingham,

---

[17]     For example, the ITC found that "[a] metric ton of domestic blast furnace coke, 2,204 pounds, was worth on average approximately $124.00 during the period of investigation." App. at 12 (citing Staff Report, tbl. V-1).

Alabama or Chicago, Illinois." *Id.* The ITC concluded that "significant freight costs from distant domestic producers are a factor in attenuating or limiting competition between the subject imports and domestic product." *Id.* at 17.

The ITC's explanation is not responsive to the court's inquiry. In *CFCT I*, the phrase "waterborne transport" referred to shipments of Subject Imports from their country of origin to the United States by oceangoing or Panamax vessel. *See CFCT I*, 27 CIT at __, slip op. 03-56 at 9 n.6; *supra* note 7. By choosing not to address this issue directly, the ITC apparently concedes that there is no evidence that waterborne transport is "far more economical" than transport over land and that it is unable to "quantify the cost differences resulting from waterborne transport and delivery of the Subject Imports when compared with the cost of transport of the domestic like product." *CFCT I*, 27 CIT at __, slip op. 03-56 at 27.

7.      ***The Court's Instruction to State the Percentage of Subject Imports Unloaded Directly from Panamax Vessels and Other Oceangoing Ships Directly for Use in the United States***

In response to the court's seventh instruction, the ITC asserted that Subject Imports "unloaded directly for consumption at [Plant A] were approximately [[          ]] percent of total imports in 1998, [[       ]] percent in 1999, [[       ]] percent in 2000, [[       ]] percent in interim 2000 and [[          ]] percent in interim 2001." App. at 17 (footnotes omitted). Plant A [[

]]. *Id.* at 20.

It is apparent that [[                    ]] of Subject Imports are "unloaded directly from Panamax vessels and other oceangoing ships directly for use in the United States . . . ." *CFCT I*, 27 CIT at __, slip op. 03-56 at 28. This evidence, together with evidence that domestic coke is used at Plant B, tends to undercut the ITC's finding that "most sales of subject imports are to steel producers with port facilities on the East Coast, which do not generally purchase domestically produced blast furnace coke at those plants." Prelim. Determination at 14–15.

**8.** ***The Court's Instruction to State with Specificity Record Evidence Demonstrating that the Superior Quality Resulting from Waterborne Transport or Delivery of the Subject Imports Created a Separate Market for the Subject Imports***

**9.** ***The Court's Instruction to Examine the Significance of the Manner and Frequency of Handling of the Subject Imports in its Product Quality Analysis***

The ITC addressed the court's eighth and ninth instructions together. As to the eighth instruction, the ITC stated:

> While we noted in our original determinations that sourcing coke through a port facility was reported to result in lower degradation of the blast furnace coke, we did not and do not assert now that the superior quality resulting from waterborne transport or delivery of the subject imports created a separate market for them.

App. at 18. This statement is responsive to the court's eighth instruction.

As for the ninth instruction, the ITC found "degradation [due to handling] does not affect the internal quality or chemistry of the coke, but if the product degrades in transit, its value falls, because less product is ultimately sold." App. at 19 (footnote omitted). "Limiting degradation, therefore, is necessary to preserve[] the value of the coke." *Id*. The ITC "relied on the evidence

provided with respect to [Plant A], which accounts for approximately [[      ]] percent of subject imports, for [its] conclusion that reduced degradation of subject imports through their delivery [at Plant A] is another factor supporting the attenuated competition between subject imports and domestic product." *Id*. at 20 (footnotes omitted).

On remand, the ITC continued to rely on the Palmer Affidavit to support the proposition that "subject imports delivered at [Plant A] are handled less and therefore degrade less, than shipments transported overland by domestic producers to the same location." App. at 19. In *CFCT I*, the court found that statements in the Palmer Affidavit "tend equally to support Plaintiffs' position that it is the frequency with which coke is handled, not necessarily mode of transportation, that leads to product degradation." *CFCT I*, 27 CIT at __, slip op. 03-56 at 23. The ITC has explained the significance of degradation on product quality and the importance of limiting the number of times coke is handled during transportation. App. at 18–19. Thus, the ITC acknowledges that the frequency of handling appears to be the important factor in product quality, not necessarily mode of transportation. *Id*. at 19 ("We do not disagree with Petitioners that the number of times the coke is handled affects the degradation of the coke.").

10. ***The Court's Instruction to State with Specificity Any Record Evidence Demonstrating that the Subject Imports are Superior in Quality to the Domestic Like Product***

11. ***The Court's Instruction to State with Specificity Any Record Evidence Demonstrating a Preference on Behalf of U.S. Blast Furnace Coke Consumers for the Subject Imports Based on Product Quality***

12. ***The Court's Instruction to State with Specificity Any Record Evidence that the Subject Imports and the Domestic Like Product are Not Fungible***

In *CFCT I*, the court discussed the ITC's findings with respect to product quality. The court stated, "In the Preliminary Determination, the ITC found that the Subject Imports, which were transported and delivered by water to U.S. steel producers' port facilities, deteriorated less in transit than domestic blast furnace coke." *CFCT I*, 27 CIT at __, slip op. 03-56 at 18 (footnote omitted). Upon examination of the sources cited by the ITC,[18] the court found that they did not support the propositions for which they were cited, i.e., that the Subject Imports were of a higher quality based on mode of transportation, i.e., that waterborne transport caused less degradation than land transport. For example, the clear import of the statements made in the Duferco Brief and sources cited therein, i.e., the testimony of Mr. Aloe and Mr. Palmer, was that *handling* of the blast furnace coke caused it to degrade physically, not that waterborne transport resulted in less degradation. *Id.* at 23.

On remand, the ITC responded to these instructions jointly under the heading "Quality and Fungibility." First, the ITC noted that the "quality" of blast furnace coke refers not only to its innate quality, but also "*how much* of it the supplier can provide that is *internally consistent*, because the blast furnace operator wants stability in the blast furnace." App. at 21 (emphasis added) ("One of the quality advantages of the subject imports is that they can reliably provide large volumes of blast furnace coke that are internally consistent."). In support of these conclusions, the ITC cited the questionnaire responses of Japanese producer [[          ]] and, on behalf of the Chinese producers, Mr. Palmer's testimony, for the proposition that Company A

---

[18]     In the Preliminary Determination, the ITC cited the following evidence to support its findings with respect to product quality: the Duferco Brief, the Palmer Affidavit, and the Joint Japanese Brief.

and Company B considered "the desire to have a stable supply of *large volumes* of high quality

material" in deciding to import blast furnace coke.  *Id*. at 22 & n.67 (emphasis added) (quoting

Tr. at 105; citing List 2, Doc. 99 at 4; Joint Japanese Br. at 9–11).  With respect to the

importance of using coke in the furnaces that is internally consistent, the ITC noted Company

A's statement that [[                                                       ]] List 2, Doc. 82 at 12, is one of the

characteristics the firm considers when determining the quality of blast furnace coke.  App. at 22.

The ITC found that "[b]last furnace coke operators strive to avoid mixing coke from too many

sources together."  *Id*. at 23.  Reportedly, foreign and domestic producers use different processes

to make coke, *see* [[                                       ]] Imp. Questionnaire Resp., List 2, Doc. 90 at 14, [[

]].  App. at 23 (footnote omitted).

          On remand, the ITC did not discount the domestic producers' capacity to supply

internally consistent coke.  Nevertheless, it found that

> they are unable to supply it in quantities sufficient to satisfy the
> demand of the primary importers of subject coke.  . . . [D]omestic
> producers' rates of capacity utilization are extremely high, and to
> some degree they are contractually bound to their existing
> customers.  Therefore, the domestic industry alone cannot fully
> supply domestic demand.  Given the desire of blast furnace
> operators to limit mixing coke from different sources, we conclude
> that the primary importers of subject blast furnace coke tend to
> source their coke from subject imports that can be reliably
> provided with adequate consistency in the large quantities required.

App. at 24.  *See discussion supra* Part I.2 (noting that in 2000, U.S. capacity was 16,681,282

metric tons, capacity utilization was 96.7%, and apparent U.S. consumption was 19,039,887

metric tons).

Second, the ITC analyzed questionnaire responses relating to purchaser preferences based on the substitutability and interchangeability of the domestic like product and Subject Imports. Based on these responses, the ITC drew the following conclusions: (1) "[d]omestic coke and subject imports from China are of limited substitutability,"[19] App. at 24, and (2) that "the evidence reflects a higher level of interchangeability between [Japanese] imports and the domestic product, than between the domestic product and subject imports from China," but that "not all questionnaire respondents found subject imports from Japan fully interchangeable with the domestic product."[20] *Id*. at 25–26.

Plaintiffs argue that the ITC relied heavily on the importance of internal consistency of the coke and the reliability of supply, which it did not do previously in the Preliminary

---

[19]     "Three out of eleven domestic producers and seven out of ten importers responded that blast furnace coke from China was 'sometimes' interchangeable with domestic product and one domestic producer and one importer stated that they were never interchangeable." App. at 24 (citing Staff Report, tbls. II-1, II-2).

[20]     According to data compiled in the Staff Report,

> [s]ix out of eleven domestic producers reported that subject imports from Japan were always interchangeable, four reported they were frequently interchangeable and one, [[          ]], that they were never interchangeable. Three out of seven import[ers] reported that subject imports from Japan were always interchangeable, two frequently interchangeable, one sometimes interchangeable, and one, [[          ]], never interchangeable.

App. at 26 n.81 (citing Staff Report, tbls. II-1, II-2).

Determination. Plaintiffs assert that a "multiplicity" of sources in China and Japan supply the Subject Imports, and that the ITC "nowhere analyzes whether imports from [those] sources [are] 'more uniform' in consistency than coke from the United States . . . ." Pls.' Comments at 16–17. While Plaintiffs concede that a supply deficit in the U.S. market exists, which the Subject Imports fill, *see id*. at 17, they argue that "[t]here is simply no evidence that domestic producers are unreliable suppliers." *Id*.

The ITC responds that in the Remand Determination it "specifically recognized that '[d]omestic producers may also be capable of supplying internally consistent coke to purchasers,' but found that the domestic industry could not provide the coke in sufficient quantities to supply the needs of the primary importers given its high capacity utilization levels and existing contractual commitments." Def.'s Comments at 15 (quoting App. at 24).

Without acknowledging the change, in response to the court's instructions, the ITC has shifted its emphasis from "quality" to "interchangeability" and quantity. In doing so, the ITC discussed certain questionnaire responses. A review of this evidence indicates that when sourcing coke, [[          ]] and [[          ]], the primary importers of the Subject Imports, sought large volumes of internally consistent coke. *See, e.g.*, List 2, [[     ]] at 4. [[          ]] reported that "Chinese coke had higher ash and moisture than U.S. coke, and some Chinese coke had better size, stability and CSR, and . . . that it was never interchangeable with domestic coke." App. at 25 (citing List 2, [[     ]] at III.B.18; Staff Report, tbls. II-1, II-2); List 2, [[     ]] at 12 (stating that "[[

]]" were characteristics considered in determining coke quality). [[          ]] reported that it

used a quality of coke produced in China that is not available domestically for [[

]] at its [[                    ]] plant.  *See* App. at 24 (citing [[                    ]] Imp.

Questionnaire Resp., List 2, [[        ]] at II-4; [[                    ]] Domestic Producers' Resp., List 2,

[[        ]] at 9); *see also* List 2, [[        ]] at 22.  While not directly responsive to the court's

instructions, the evidence nevertheless provides a rational basis for the ITC's new findings as to

interchangeability and quality.


While the ITC has not entirely complied with the court's remand instructions, its

responses are sufficient to establish: (1) that the phrase "attenuated competition," both as used in

the Preliminary Determination ("to a great extent" the majority of Subject Imports do not

compete with the domestic product, Prelim. Determination at 26) and as used in the Remand

Determination, (attenuated competition means competition that is "reduced [in] force or effect,"

Remand Determination at 3) because of its vague definition, lack of methodology, and lack of

quantification established by record evidence, is of limited utility on judicial review; (2) that the

ITC's finding that the majority of Subject Imports "to a great extent" do not compete with

domestically produced blast furnace coke is sufficiently exaggerated so as not to be supported by

clear and convincing evidence[21]; and (3) that in its Remand Determination the ITC has

---

[21]     In particular, the ITC has not supported with clear and convincing evidence its findings (a) that waterborne transport is more economical than land transport, (b) that most sales of Subject Imports were to U.S. steel producers with blast furnace facilities equipped to receive the imports by water, and (c) that blast furnace coke transported over water resulted in less product degradation than coke transported over land.  *See CFCT I*, 27 CIT at __, slip op. 03-56 at 17–18, 23.

established through the use of clear and convincing record evidence certain facts relating to

lessened competition between the Subject Imports and the domestic like product that tend to

support a finding of attenuated competition using the ITC's new definition, i.e., reduced in force

or effect. In addition, by largely abandoning the construct of attenuated competition in its results

on remand, the ITC has dramatically reduced its importance in reaching its determination.

Indeed, on remand, the ITC asserted that attenuated competition "was not central to [its] analysis

of volume, price effects and impact of the subject imports, with respect to either our negative

material injury or threat of material injury analysis," Remand Determination at 9; the phrase

"attenuated competition" only appears in a footnote in the threat of material injury analysis. *Id*.

at 36 n.147 ("Our finding of attenuated competition, based on all of the factors listed, is in turn

one factor among many supporting our negative determinations and our finding of no causal

connection between the domestic industry and the subject imports."). With this in mind, the

court turns to an analysis of the remaining issues relating to the negative preliminary injury

determination.

II.     *Negative Preliminary Injury Determination*

The ITC is charged with the duty of making a preliminary injury determination under 19

U.S.C. § 1673b(a) "based on the information available to it at the time of the determination,

whether there is a reasonable indication that . . . an industry in the United States— (i) is

materially injured, or (ii) is threatened with material injury . . . by reason of imports of the subject

merchandise . . . ." 19 U.S.C. § 1673b(a)(1)(A)(i)–(ii). A negative preliminary injury

determination is permissible where the ITC finds that "(1) the record as a whole contains clear

and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *Am. Lamb. Co.*, 785 F.2d at 1001. Here, the ITC determined that there was no reasonable indication that the domestic blast furnace coke industry was materially injured or threatened with material injury by reason of the Subject Imports,[22] and accordingly terminated its investigation. *See* Remand Determination at 2; 19 U.S.C. § 1673b(a)(1). Plaintiffs insist that the ITC's finding of attenuated competition, found in the Preliminary Determination, is central to the determinations with respect to material injury and threat. The ITC now maintains, and the court agrees, based on the findings contained in the Remand Determination, that the finding of attenuated competition is not critical to the material injury and threat determinations. The court shall examine the ITC's material injury and threat of material injury determinations in turn.

### A.       *No Reasonable Indication of Material Injury*

In determining whether there is a reasonable indication of material injury, the ITC is required by statute to consider:

> (I) the volume of imports of the subject merchandise,
>
> (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
>
> (III) the impact of imports of such merchandise on domestic producers of domestic like products . . .; and
>
> may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason

---

[22]       The ITC cumulatively assessed the effect of imports from China and Japan, pursuant to 19 U.S.C. § 1677(7)(G). The ITC's decision to cumulate imports is not in dispute.

of imports.

19 U.S.C. § 1677(7)(B)(i)–(ii).  Plaintiffs challenge the ITC's findings with respect to volume,

price effects, and impact.  Each of these findings is examined below.

### 1.    *Volume*

The ITC's volume determination requires an evaluation of "whether the volume of

imports of the merchandise, or any increase in that volume, either in absolute terms or relative to

production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

Here, the ITC determined that the volume of Subject Imports was not significant, either in

relative or absolute terms, in the Preliminary Determination, and reaffirmed that finding on

remand.  *See* Prelim. Determination at 23; Remand Determination at 21.  In the Remand

Determination, the ITC stated:

> The volume of cumulated subject imports measured in quantity
> decreased overall from 1998 to 2000, and was 37.1 percent lower
> in interim 2001 than in interim 2000.  The volume of cumulated
> subject import shipments in the U.S. market fell at a sharper rate
> than demand.  The domestic industry captured a significant share
> of the market, ranging from 83 and 86 percent of the U.S. market
> over the period of investigation, while subject imports held a more
> minor share, ranging between 16.7 percent and 13.8 percent of the
> U.S. market, during the same period.  The share of the U.S. market
> held by cumulated subject imports declined over the period of
> investigation, and was sharply lower in interim 2001 as compared
> to interim 2000, while the U.S. producers' share of the U.S. market
> increased somewhat from 1998 to 2000, and was higher in interim
> 2001 than in interim 2000.  Due to the overall decline in relative
> and absolute volume of subject imports during the period of
> investigation, we find the volume of subject imports not to be
> significant.

Remand Determination at 20–21 (citing Staff Report, tbl. IV-2; tbl. C-1; tbl. IV-6).

Plaintiffs challenge (1) the ITC's use of import shipment data instead of import data[23] in evaluating the significance of import volume, (2) the ITC's reliance on questionnaire responses as a source of data,[24] and (3) the alleged failure on the part of the ITC to consider the need to "hot-idle" coke batteries in evaluating the significance of import volume.[25]  *See* Pls.' Mem. at 26–27; Pls.' Comments at 22 ("[F]or technical reasons coke batteries cannot adjust production to fit market demand"; thus, Plaintiffs argue that it is "inconsistent and irrational for the Commission to . . . claim that high capacity utilization evidences absence of injury.").

_____

[23]     The distinction between import data and import shipment data is explained by the ITC as follows:

> Import data reflect import volume as it enters the United States, which may include imports that remain in inventory and do not immediately enter the market.  Import shipment data reflect import volume that is shipped into the U.S. market during a certain period surveyed, which may also include inventory that is being shipped.

ITC's Conf. Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Resp.") at 18 n.27.

[24]     As to the source of import data, Plaintiffs argue that the ITC should have used data compiled by a trade organization called the American Coal and Coke Chemicals Institute ("ACCCI"), which data, Plaintiffs argue, is more comprehensive than data gathered from importer questionnaire responses.  Pls.' Mem. at 26.  Plaintiffs contend that "[c]onsidering the reliability of the ACCCI data and the incompleteness of the questionnaire responses in terms of not covering close to all of the subject imports, there was a likelihood that contrary evidence would arise in a final investigation . . . ."  Pls.' Reply to Def.'s Mem. Opp'n at 10; Pls.' Mem. at 7 ("[T]he final investigation would also show whether data . . . collected with broader coverage agrees with industry data that shows a modest increase in imports of 3.6 percent and a relative increase in imports of 1.1 percent in 1998–2000.").

[25]     According to Plaintiffs, when demand for blast furnace coke declines, the coke batteries must nevertheless be "hot-idled" to prevent deterioration of the interior of the battery. Therefore, coke producers cannot adjust production to fit demand, and must pay high energy costs to run the batteries with "no production or revenue."  Pls.' Mem. at 27.  What Plaintiffs appear to be arguing is that because they cannot adjust production to fit demand, blast furnace coke must continue to be produced irrespective of demand.

First, the ITC acknowledges that "[t]he cumulated imports' share of the U.S. market . . . is measured in terms of U.S. shipments . . . ." Def.'s Resp. at 16 (footnote omitted). However, the ITC notes that "[i]n this investigation, imports and import shipments are similar in every period surveyed."[26] Id. at 18. Second, the ITC argues that, in the exercise of its discretion to weigh the probative value and relevance of evidence, it "reasonably chose data collected [by way of questionnaires] in accordance with long-established procedures that are transparent to all parties concerned." Id. at 20–21 (citing Iwatsu Elec. Co. v. United States, 15 CIT 44, 56, 758 F. Supp. 1506, 1517 (1991)). The ITC further claims that the data it used was based on actual certified data from firms representing the majority of imports, was reliable, and could be used consistently for import volume and market share. Id. at 20 n.32. ACCCI data, on the other hand, "employs a methodology for estimating blast furnace coke imports, rather than relying on actual data, which . . . the ITC gathered in its investigation." Id. at 19–20 (footnotes omitted). Moreover, "[t]he ITC had no means by which to corroborate the ACCCI data through independent sources, as it is statutorily required to do with secondary sources, when practicable." Id. at 20 (citing 19 U.S.C. § 1677e(c)); thus, "neither the ITC nor other parties could review [this] methodology for gathering import data other than the explanation provided at the conference." Id. As for Plaintiffs' argument with respect to "hot-idling," i.e., that for technical reasons, production cannot be modified to fit demand, the ITC asserts that "Plaintiffs have not

---

[26]     According to import data, the volume of Subject Imports declined from 3,199,083 to 2,703,824 metric tons from 1998 to 1999, and increased to 3,198,012 in 2000. The quantity of Subject Imports in interim 2001 dropped from 872,845 to 548,655 metric tons. Staff Report, tbl. IV-2. According to import shipment data, the volume of Subject Imports decreased from [[                    ]] to 2,789,614 metric tons from 1998 to 1999, and increased to 3,149,625 in 2000. The quantity of Subject Imports in interim 2001 dropped from 799,063 to 591,833 metric tons. Staff Report, tbl. IV-4.

demonstrated that the domestic industry had significant coke production that it was unable to sell at market prices." *Id*. at 15 n.23. Finally, the ITC suggests that there was in fact no excess production since "domestic producer inventories declined by 25.6 percent from 1998 to 2000." *Id*. (citing Staff Report, tbls. III-5, C-1).

The court finds that the ITC's volume determination is based on clear and convincing evidence and thus is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(A). As an initial matter, the court finds that the ITC did not err by looking to import shipment data in evaluating the significance of import volume relative to domestic consumption. Title 19 U.S.C. § 1677(7)(C)(i) requires the ITC to consider whether the volume of imports, in absolute terms or relative to production or consumption in the United States, was significant. *See USX Corp. v. United States*, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) (citing *Atl. Sugar, Ltd. v. United States*, 2 CIT 18, 23, 519 F. Supp. 916, 921–22 (1981)) ("Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)."). The statute does not preclude the use of import shipment data, or for that matter, specify the data on which the ITC may rely. *See* 19 U.S.C. § 1677(7)(C)(i); *see Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1064–65 (1995). Rather, Congress left it to the discretion of the ITC to decide, based upon the evidence available to it and the nature of the industry under investigation, whether import volume was "significant." *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1419, 182 F. Supp. 2d 1330, 1335 (2001) (citing S. REP. NO. 96-249, 96th Cong., 1st Sess. at 88, *reprinted in* 1979 U.S.C.C.A.N. 381,

474) ("The significance of the various factors affecting an industry will depend upon the facts of each particular case."). Indeed since import shipment data would record only that portion of imports that actually enters the market (rather than being stored in inventory) its use for purposes of assessing injury is reasonable. Thus, the court finds the ITC's use of import shipment data is in accordance with law.

In addition, the ITC's volume determination is supported by the record. Import shipment volume mirrored actual import volume, according to the Staff Report. When the data in Tables IV-2 (representing imports) and IV-4 (representing shipments of imports) are compared, they show that both actual imports and shipments of imports decreased between 1998 and 1999, and increased between 1999 and 2000, though not to 1998 levels. *Compare* Staff Report, tbl. IV-2 (import volume) *with* tbl. IV-4 (import shipment volume). These data are consistent with the ITC's finding that import volume decreased overall during the period of investigation. In addition, in the Remand Determination the ITC compared both import data with import shipment data, and demonstrated that they both supported the same conclusion. *See* Remand Determination at 20 & nn.84 (citing Staff Report, tbl. IV-2 (import data)), 85 (citing Staff Report, tbl. C-1) (discussing decrease in volume of U.S. shipments of cumulated subject imports during the period of investigation).

In evaluating the significance of import volume, the quantified amount of imports is not necessarily determinative. Rather "the Commission must assess the extent to which, if at all, subject imports 'captured' market share from the domestic industry over the [period of

investigation].  This inquiry typically entails accounting for an increase or decrease in domestic

producer's market share and in domestic consumption overall." *Nippon Steel*, 25 CIT at 1420,

182 F. Supp. 2d at 1335 (citation omitted).  Here, the ITC properly evaluated the significance of

import volume in the context of the marketplace by examining what portion of U.S. market share

was held by the domestic producers *vis a vis* the Subject Imports during the period of

investigation.  *See* Remand Determination at 20 ("The domestic industry captured a significant

share of the market ranging between 83 and 86 percent of the U.S. market over the period of

investigation, while subject imports held a more minor share, ranging between 16.7 percent and

13.8 percent of the U.S. market, during the same period.").  The record shows that apparent U.S.

consumption decreased overall during the period of investigation.  *See* Staff Report at IV-6.  The

evidence also shows that the share of the U.S. market held by the domestic producers increased

during the period of investigation and ended higher in interim 2001 than in 2000.  *See id*.  At the

same time, the share of the U.S. market held by Subject Import shipments declined, and ended

lower in interim 2001 than in 2000.  *See id*.  Thus, the ITC's finding that the volume of Subject

Imports was not significant is supported by clear and convincing evidence and is not arbitrary or

capricious or otherwise not in accordance with law.


The court finds Plaintiffs' remaining arguments unpersuasive.  The ITC did not err by

considering questionnaire responses instead of ACCCI data.  Plaintiffs' main complaint is that

the questionnaire responses collected by the ITC do not cover 100% of imports.  Although the

ITC concedes its information was not complete, e.g., that 20% of U.S. imports from China were

not accounted for by the questionnaire responses, the ITC "is not required to gather 100%

coverage in the questionnaire responses before it can make a determination." *United States Steel Group v. United States*, 18 CIT 1190, 1203, 873 F. Supp. 673, 688 (1994) (in context of final determination); *Torrington Co. v. United States*, 16 CIT 220, 223–24, 790 F. Supp. 1161, 1166 (1992), *aff'd* 991 F.2d 809 (Fed. Cir. 1993) (finding in the context of a preliminary determination that the ITC did not abuse its discretion by using questionnaire responses that "represented a substantial majority of domestic production"). The questionnaire responses report import data from firms accounting for approximately 80% of U.S. imports from China during the period of investigation, and virtually all U.S. imports from Japan during that same period. *See* Staff Report at I-3. The accuracy of those responses is undisputed. Moreover, Plaintiffs have not demonstrated that data concerning the remaining 20% would show different trends. As the ITC had actual data, there was no need to rely on unverified estimates, and the ITC acted within the bounds of its discretion in not relying on ACCCI data.

In addition, the court is not persuaded that there is a likelihood that contrary information would arise in a final investigation. A showing of likelihood requires more than speculation, or the indication that something possibly might happen. *See Nippon Steel Corp. v. United States*, 26 CIT __, slip op. 02-153 at 7–8 (Dec. 24, 2002) (finding "likely means probable within the context of 19 U.S.C. §§ 1675(c) and 1675a(a)"). Thus, Plaintiffs' assertion that "more complete importers' questionnaire data in a final investigation would likely confirm that imports were increasing," Pls.' Mem. at 14, without more, is not enough to compel continuation of the investigation.

Finally, Plaintiffs' argument that the volume of Subject Imports is significant in light of the need to "hot-idle" coke batteries is unpersuasive. Plaintiffs argue that "increasing or constant levels of imports or declining levels of subject imports are significant" because, for technical reasons, production cannot be adjusted to fit demand, and "[h]ot idling requires huge energy costs with no production or revenue." Pls.' Mem. at 27. As a result, Plaintiffs claim that "it is inconsistent and irrational for the Commission to . . . claim that high capacity utilization evidences absence of injury." Pls.' Comments at 22. It is clear, however, that the ITC considered the need to hot-idle coke batteries as a condition of competition in the industry in evaluating the significance of the volume of Subject Imports:

> Batteries are occasionally "hot-idled," where the temperature is maintained but coal is not charged, and coke is not produced. Petitioners maintain that hot-idling provides little savings due to the high energy costs required to keep the ovens hot. Therefore, they allege that they cannot adjust production to fit market demand.

Prelim. Determination at 18 (footnotes omitted). In addition, Plaintiffs' failure to demonstrate that it was unable to sell coke at market prices, and evidence that inventories were falling, tend to undermine Plaintiffs' argument. Although Plaintiffs disagree with the weight that the ITC assigned to this evidence, "[i]t is within the Commission's discretion . . . to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985) (citation omitted).

The ITC's determination that Subject Import volume was not significant, in light of decreasing demand for blast furnace coke, a decrease in the share of the U.S. market held by the Subject Imports, and a concurrent increase in the share of the U.S. market held by the domestic

producers, evinces a "rational nexus between the facts found and the choices made." *Conn. Steel Corp.*, 18 CIT at 315, 852 F. Supp. at 1064 (citation omitted). Accordingly, the ITC's volume determination is sustained.

### 2.      *Price Effects*

As to price effects, the ITC must consider whether "(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States," and "(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii).

Here, the ITC determined that underselling, although pervasive during the period of investigation,[27] did not result in significant adverse price effects. The ITC found that the Subject Imports had not depressed domestic prices:

> Prices for the domestic like product generally fluctuated within a
> range of less than eight percent over the period of investigation.

---

[27]      The ITC found:

> Prices for imports from China and Japan undersold domestic
> product in all fourteen quarters examined. Margins of underselling
> by imports from China ranged from [[      ]] percent to [[     ]]
> percent. Margins of underselling by imports from Japan ranged
> from [[     ]] percent to [[     ]] percent. We do not find,
> however, that underselling by the subject imports has had
> significant adverse price effects.

Prelim. Determination at 24 (citation omitted). The ITC reiterated this finding on remand. *See* Remand Determination at 21.

> More specifically, reported weighted average domestic prices for
> blast furnace coke increased steadily through the end of 1998
> before peaking in the last quarter of 1998 at $130.38 per MT.
> Domestic prices declined irregularly in 1999, ending the last
> quarter of 1999 at $122.51 per MT. Including the last quarter of
> 1999, reported domestic prices stayed essentially flat for seven
> consecutive quarters. Domestic prices stayed relatively flat during
> the period of investigation despite the vacillations in the prices of
> subject imports from China and Japan during this period. U.S.
> producers' prices were at approximately $120 to $122 at the
> beginning and at the end of the reporting period. Thus, we find no
> evidence of significant price depression.

Remand Determination at 22–23 (footnotes omitted).

The ITC also determined that "there is no indication that the subject imports have

prevented price increases, which would otherwise have occurred, to a significant degree."

Remand Determination at 23. The ITC found:

> The pricing data obtained show that domestic prices bore little
> relationship to the prices of subject imports, in light of the fact that
> domestic prices fell at times when the level of subject import prices
> was rising, and vice-versa. Domestic prices remained constant in
> 2000 and 2001, while prices of subject imports from both China
> and Japan vacillated, first decreasing and then increasing. In
> addition, unit costs and the ratio of cost of goods sold to net sales
> revenue for the industry generally declined over the period of
> investigation. Specifically, unit costs and the ratio of cost of goods
> sold to net sales declined overall between 1998 and 2000, with a
> small increase in these data in interim 2001 relative to interim
> 2000, on both an overall and trade-only basis. This pattern
> suggests that domestic prices have not been significantly
> suppressed relative to costs. Moreover, the record contains no
> substantiated lost sales or lost revenues that would link prices for
> subject imports to depressed or suppressed domestic prices.

*Id*. at 23–24. Thus, the ITC reconfirmed its determination that the Subject Imports did not have a

significant adverse impact on the price of the domestic like product.[28]

Plaintiffs take issue with the ITC's price effects analysis. Though somewhat difficult to tease out, Plaintiffs appear to argue that price and volume data were available separately for the merchant producers and the captive producers, and that these data should have been evaluated separately for each. Thus, Plaintiffs seek a "separate analysis by the ITC staff of merchant producer pricing, which better reflects current market conditions through arms-length transactions than integrated producer transfers, [that would show] the downward trend below cost of production by the end of the POI." Pls.' Mem. at 6. In addition, Plaintiffs assert that, had the ITC looked into price effects on merchant producers, the evidence would have supported a finding that prices were depressed to a significant degree. *See* Pls.' Comments at 25. Plaintiffs argue that the "Preliminary Determination and the Remand Results ignore [record] evidence" that Plaintiffs claim shows significant price depression experienced by merchant producers. *Id*.

The ITC urges the court to reject Plaintiffs' argument that "the ITC should have considered merchant producer pricing data separately from overall domestic industry pricing data . . . ." Def.'s Resp. at 22–23. The ITC states that it "found as a condition of competition that there were two segments of the domestic industry – the 'captive' segment and the merchant market segment"; it "did not find that integrated *producers* and merchant *producers* were

---

[28]     By way of explanation in the Preliminary Determination, the ITC stated that its attenuated competition analysis indicated that the majority of Subject Imports "to a great extent do not compete with domestically produced blast furnace coke . . . ." Prelim. Determination at 26.

separate segments of the market. Indeed, the ITC found that integrated producers dominated the

merchant market which they share with the merchant producers." *Id*. at 22 (citing Prelim.

Determination at 19); Def.'s Comments at 8 ("Plaintiffs' reliance on the merchant producer

pricing data in isolation is unwarranted," as "[i]ntegrated producers shipped [[                    ]] of

total domestic merchant market shipments in 2000, and there is no reason to ignore these data.").

The ITC asserts that it is required, under 19 U.S.C. §§ 1677(4)(A), 1677(7)(B) and (C)(ii), to

analyze pricing based on overall domestic industry data, and that by considering data for the

domestic industry as a whole, it fulfilled its statutory obligation here. *See* Def.'s Resp. at 22

("The ITC is required to consider whether the domestic industry as a whole has experienced

negative price effects, not whether a segment of the domestic industry has experienced negative

pricing effects."). In other words, the ITC found no reason to separate producers who sold their

product exclusively in the merchant market, from those who sold only a portion of their

production on the merchant market, when evaluating the domestic industry pricing data.

The court finds the ITC's price effects determination is supported by clear and convincing

evidence and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law . . . ." 19 U.S.C. § 1516a(b)(1)(A). As an initial matter, the court finds that the ITC did

not err in basing its determination on data representing the experience of the domestic industry as

a whole, rather than on the experience of merchant producers and integrated producers

separately.[29] Congress charged the ITC with the duty to determine whether "an industry in the

---

[29]    While, as Plaintiffs point out, the dissenting Commissioners refer to evidence in
the record in "Table A," which tabulates price data for merchant producers alone, *see* Dissenting

(continued...)

United States" is suffering material injury by reason of dumped imports. *See* 19 U.S.C. §

1673b(a)(1)(A). Title 19 U.S.C. § 1677(4)(A) defines "industry" as "the producers as a whole of

a domestic like product, or those producers whose collective output of a domestic like product

constitutes a major proportion of the total domestic production of the product." *Id*. In *Calabrian*

*Corp. v. United States Int'l Trade Comm'n*, 16 CIT 342, 350, 794 F. Supp. 377, 385 (1992), the

court found it was clear from the language of 19 U.S.C. § 1677(4)(A) (1988)[30] that "Congress

intended for the Commission to consider the entire industry" in making its preliminary injury

determination. In so finding, the court noted the following analysis in *Copperweld Corp. v.*

*United States*, 12 CIT 148, 165–66, 682 F. Supp. 552, 569 (1988), with approval:

> [The] language [of 19 U.S.C. § 1677(4)(A)] makes manifestly clear
> that Congress intended the ITC determine whether or not the
> domestic industry (as a whole) has experienced material injury due
> to the imports. This language defies the suggestion that the ITC
> must make a disaggregated analysis of material injury.

*Id*. This reasoning is equally applicable here. In this case, the ITC considered the experience of

all those who sold on the merchant market in reaching its determination with respect to the

industry as a whole.

Turning to the ITC's analysis of underselling, price depression, and price suppression,

---

[29](...continued)
Views at 41 n.20, nowhere in their views do the Commissioners take the position that the ITC
should not analyze pricing based on overall domestic industry data.

[30]        The 1988 version and the 2000 version of 19 U.S.C. § 1677(4)(A) are
substantially identical. The 1988 version defined "industry" as "the domestic producers as a
whole of a like product, or those producers whose collective output of the like product constitutes
a major proportion of the total domestic production of that product . . . ." 19 U.S.C. §
1677(4)(A) (1988).

using evidence of sales in the merchant market as a whole, the court finds that the ITC complied

with 19 U.S.C. § 1677(7)(C)(ii), and did not err in finding these factors were not significant.

Although the Subject Imports undersold the domestic like product throughout the period of

investigation, the evidence indicates that the price of the domestic like product did not react

negatively to the price charged for imports. The evidence shows that the weighted-average price

per metric ton of the domestic like product increased steadily in 1998, peaking in the fourth

quarter of 1998. Staff Report, tbl. V-I (quarterly weighted-average f.o.b. prices and quantities of

product shipped by U.S. producers and importers, and margins of underselling/overselling during

the period of investigation). Prices trended slightly downward in 1999 and 2000, but did not

decline to a price lower than that experienced in the first quarter of 1998 in any full year. *Id*.

Overall, as the ITC observed, "U.S. producers' prices were at approximately $120 to $122 at the

beginning and at the end of the reporting period." Remand Determination at 23. In comparison,

as noted by the ITC, and as the evidence shows, the weighted-average prices of the Subject

Imports "vacillated" during the period of investigation, thus "indicating no clear correlation

between prices of the subject imports and domestic prices." Remand Determination at 23 n.95;

*see, e.g.*, Staff Report, fig. V-3 & tbl. V-1. A finding of material injury requires a causal, not

merely temporal, connection between less than fair value sales and material injury. *Gerald*

*Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (applying pre-URAA law); *see*

*also Taiwan Semiconductor Indus. Ass'n v. United States Int'l Trade Comm'n*, 266 F.3d 1339,

1345 (Fed. Cir. 2002) (noting "[t]he URAA did not deviate from the pre-existing causation

standard enunciated in *Gerald Metals*."). Mere presence of dumped imports in the U.S. market is

not enough. The court finds that it was reasonable to conclude that the Subject Imports, although

sold at a lower price than the domestic like product during the period of investigation, did not have a significant effect on the prices of the domestic like product.  Accordingly, this finding is sustained.


The ITC used attenuated competition as a partial explanation for its findings in the Preliminary Determination.  Although, as previously noted, the construct of attenuated competition is of limited utility, the evidence cited by the ITC in support of this finding on remand tends to support the conclusion that competition between Subject Imports and the domestic like product was lessened by certain conditions of competition, for example, the large percentage of Subject Imports delivered directly to Plant A.  On that point, the ITC stated:

> Petitioners argue that import pricing for sales to [Plant A] and [[
> ]] [two plants which receive Subject
> Imports,] undermined market prices elsewhere in the merchant
> market, . . . but they supplied no evidence of this, or evidence that
> any domestic producers attempted to compete for that business.
> Although one domestic producer testified that it unsuccessfully
> attempted to negotiate a sale to a customer that purchased Chinese
> coke,  . . . that producer offered no documentation for the alleged
> lost sale.

Remand Determination at 24 n.100.  Although, as previously noted, the construct of attenuated competition is of limited utility, using its new definition of attenuated competition, as "reduced [in] force or effect," the ITC has established this claim by sufficient evidence.


### 3.    *Impact*

When examining the impact of imports on the domestic industry, the ITC is required to evaluate

all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in [an antidumping duty] proceeding . . ., the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii)(I)–(V). These factors must be evaluated "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

Here, the ITC found no reasonable indication that the Subject Imports have had a significant adverse impact on the domestic industry:

> The record in these investigations indicates that the profitability of the domestic industry fluctuated within a narrow range over the period of investigation, as did several of the other economic indicators, even during the period between 1999 to 2000 when import volumes increased. Thus, there was no meaningful correlation between subject import volume and the financial condition of the domestic industry. Profitability for the domestic industry increased at the same time that subject import volumes increased, and likewise, profitability declined between 1998 and 1999 as import volumes declined. For example, cumulated subject import volume increased from 1999 to 2000 while operating income as a share of sales rose from negative 1.1 to a positive 1.1

percent during the same period. Similarly, operating margins fell to unprofitable levels when cumulated subject import volume declined. *Cumulated subject import volume fell from 1998 to 1999, at the same time that the operating income as a share of sales fell from positive 0.5 percent to a negative 1.1 percent.* The volume of cumulated subject imports was 37.1 percent lower in interim 2001 than in interim 2000. During this time, operating income as a share of sales fell from a positive 1.6 percent to a negative 0.9 percent. Thus, when subject import volume was decreasing, the domestic industry was less profitable, and when import volume was increasing, the domestic industry was more profitable. For this reason, we find no causal nexus between subject imports and the financial health of this industry.

Remand Determination at 26–27 (footnotes omitted; emphasis added). With respect to sales, productivity, capacity, inventory, employment, wages, the per unit cost of goods sold,[31] capital expenditures, and research and development, the ITC found that these economic indicators "fluctuated within a narrow range, while capacity utilization rates were high."[32] *Id.* In light of declining import volume and the lack of significant price effects that could be linked to the Subject Imports, the ITC concluded the impact of Subject Imports on the domestic industry was not significant. *Id.* at 29.

Plaintiffs' major contention with respect to impact is that the data underlying the ITC's cost of goods sold and operating income findings is flawed. Plaintiffs allege that, although certain revisions were made to financial data submitted by Company B with respect to [[

---

[31]     "Blast furnace coke production creates by-products which can be sold and thereby reduce the cost of production (i.e., the cost of goods sold or 'COGS')." Def.'s Resp. at 25.

[32]     The ITC considered estimated antidumping duty margins of 132.2% to 207.2% for China and 71.66% for Japan, pursuant to 19 U.S.C. § 1677(7)(C)(iii)(V). Remand Determination at 26 n.104 (citing Certain Blast Furnace Coke Prods. From the P.R.C. and Japan, 66 Fed. Reg. at 39,009).

]] profit and loss statements for that company and the ITC's Staff Report were not amended to reflect the changes. *See* Pls.' Mem. at 22; Pls.' Comments at 26. The thrust of Plaintiffs' argument is that the data on which the ITC relied does not accurately reflect the financial state of the domestic industry,[33] and that "[h]ad the [Commissioners] had [the revised data] in front of them at the time of the vote, [the ITC] may have reached a different finding on the financial health of the industry." Pls.' Mem. at 22.

The ITC contends that in making its impact determination, it "examined the import volume data from the staff report . . . [which] included [the] revisions" made by Company B to [[

]]. Def.'s Comments at 10. As a result of these revisions, the Staff Report stated that [[

]], Staff Report at VI-29 n.18, and that [[

]]. *See* Def.'s Resp. at 27. In other words, according to the ITC, Company B had made an error with respect to one entry only, and that the correction of that error did not require recalculation of the entire table. The ITC argues that "Plaintiffs have failed utterly to establish any reason for the Commission to have revised Company B's [[

---

33          Plaintiffs offer "corrected" data and reproduce those corrections in their Memorandum. Plaintiffs contend that these data "[[

]] as demand sharply reduced, prices fell, particularly for the merchant sector of the industry – as underselling continued." Pls.' Comments at 26. In response, the ITC argues that the "corrected" data Plaintiffs argue more accurately reflects the financial condition of the industry should be disregarded, as they are based on "unilateral, unwarranted modifications to [[          ]] financial data . . . ." Def.'s Comments at 10.

]]. . . ." *Id*. (emphasis in

original).

The court finds that the ITC's impact determination is supported by clear and convincing

evidence and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law . . . ." 19 U.S.C. § 1516a(b)(1)(A). The evidence supports the ITC's findings with

respect to profitability, sales, productivity, capacity, inventory, employment, wages, the per unit

cost of goods sold, capital expenditures, and research and development. The ITC properly

evaluated the financial condition of the industry as a whole, finding "no correlation existed

between subject import volumes and the financial performance of the domestic industry . . . ."

Remand Determination at 29. As for Plaintiffs' argument that the ITC relied on inaccurate

financial data, in accordance with Company B's instructions the ITC staff made modifications

submitted by Company B to the byproduct revenue information only. *See* Staff Report at VI-29,

nn.18 & 19. Under these circumstances, the court finds no clear error in judgment on the part of

the ITC in relying on this evidence. As such, the ITC's findings based thereon are sustained.

**B.**      *No Reasonable Indication of Threat of Material Injury*

Finally, the court examines the ITC's determination that there was no reasonable

indication of threat of material injury by reason of the Subject Imports. The ITC is directed by

statute to consider certain factors,[34] which must be analyzed "as a whole in making a

[34]      In making this determination, the ITC considers the following factors:

(I) [factor pertaining to countervailable subsidies],

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) [factor pertaining to agricultural products],

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i)(I)–(IX). Factors I and VII were not relevant to the ITC's determination.

determination of whether further dumped or subsidized imports are *imminent* and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted . . . ." 19 U.S.C. § 1677(7)(F)(ii) (emphasis added). "An affirmative threat determination must be based upon 'positive evidence tending to show an intention to increase the levels of importation,'" not mere speculation. *Metallverken Nederland B.V. v. United States*, 14 CIT 481, 488, 744 F. Supp. 281, 287 (1990) (quoting *Am. Spring Wire v. United States*, 8 CIT 20, 28, 590 F. Supp. 1273, 1280 (1984)).

Upon consideration of these factors, as well as other relevant economic factors and the conditions of competition in the domestic industry, the ITC found that "the recent decrease in cumulated subject imports volume, U.S. shipments of subject imports, and market share, along with a general lack of evidence of future increased imports by the primary U.S. importers,"[35] militated in favor of a negative threat determination. Remand Determination at 36.

---

[35]     The ITC found that

> [t]here is no evidence on the record of an imminent, substantial increase in production capacity in China or Japan, nor is there evidence of a likelihood of substantially increased imports of the subject merchandise because the vast majority of subject imports during the period of investigation were destined for [Company A and Company B]. The record does not reflect any intent on the part of [either company] to increase their imports or purchases in the future. Indeed, [Company A] has stated that it will require [[
>      ]] fewer MT of subject imports annually when [[
>
>      ]].

Remand Determination at 31 (footnote omitted).

Plaintiffs rest their challenge to the ITC's threat determination primarily on their argument that the attenuated competition finding was erroneous. Pls.' Mem. at 29 ("The [ITC]'s negative threat determination depends . . . on its erroneous attenuated competition conclusion that disconnects future underselling at any level of import penetration by future subject imports."). As discussed above, the phrase "attenuated competition" is of little use in reviewing the ITC's determination. Nonetheless, the facts marshaled by the ITC are useful in establishing conditions of lessened competition, or as the ITC defined attenuated competition on remand, as competition that is reduced in force or effect, i.e., (1) [[                                       ]] of Subject Imports arrived in the United States by oceangoing vessel, and (2) the majority of Subject Imports are imported or purchased by Company A and Company B, and that the portion delivered to Company A is directly delivered to Plant A. In addition, these companies require large amounts of blast furnace coke that is internally consistent. These factors and the other evidence discussed *supra* Part I., sections 1 and 2, demonstrate that there is some lessening of direct competition between the Subject Imports and the domestic like product. Here too, however, the attenuated competition finding is not crucial. Rather, on remand the ITC reasonably relied on other factors in reaching its determination.

Plaintiffs' other arguments concerning capital expenditures are unpersuasive. It is apparent from the original and remand determinations that the ITC considered any actual or potential negative effects the Subject Imports had on development and production efforts and reasonably concluded that they would not have an effect on capital expenditures. The court finds that the record supports the ITC's threat determination, and in light of the foregoing, it is

sustained.

**CONCLUSION**

The court concludes that the ITC did not err in determining that the record as a whole

provides clear and convincing evidence of no reasonable indication of material injury or threat of

material injury.  Further, Plaintiffs have failed to demonstrate that there is a likelihood that

contrary evidence would arise in a final investigation.  Therefore, Plaintiffs' motion is denied and

the ITC's negative preliminary injury determination, as modified on remand, is sustained.

Judgment shall be entered accordingly.


                                                    /s/ Richard K. Eaton
                                                Richard K. Eaton, Judge



Dated:  June 10, 2004
        New York, New York